

## Fourth Court of Appeals
### San Antonio, Texas

### MEMORANDUM OPINION

No. 04-25-00041-CR

Guy Dean **PEELE**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 218th Judicial District Court, Wilson County, Texas
Trial Court No. CR.W.2110210
Honorable Russell Wilson, Judge Presiding

Opinion by:     Lori I. Valenzuela, Justice

Sitting:          Irene Rios, Justice
                  Lori I. Valenzuela, Justice
                  Velia J. Meza, Justice

Delivered and Filed: April 15, 2026

AFFIRMED

Appellant Guy Dean Peele was indicted and found guilty of indecency with a child—S.S.—

by sexual contact.[1] In six appellate issues, Peele challenges the sufficiency of the evidence

---

[1] To protect the privacy of the minor complainant and minor witnesses, we will refer to them only by their initials. We will refer to the minor complainant's mother, who testified at trial, only by her first name. *See* TEX. R. APP. P. 9.10 (defining "sensitive data" in a criminal case to include "the name of any person who was a minor at the time the offense was committed").

supporting the jury's verdict, the trial court's evidentiary rulings, and the State's closing argument. We affirm.

## BACKGROUND

In the summer of 2021, Peele was seeking a babysitter for his daughter, C.P. Fourteen-year-old S.S. was recommended to him as a suitable candidate. It was agreed that S.S. would accompany Peele, C.P., and C.P.'s friend, R.W., to a pool party, and then S.S. would sleep over at Peele's house with the other two girls to see if the babysitting arrangement would be a good fit. Peele and S.S. did not know each other, so it was decided that Peele would talk to S.S.'s mother, Kimberly, who approved the plan.

The four went to the pool party, rode four-wheelers, and stayed at Peele's house that evening. The next day, the girls woke up around noon and got their nails done before S.S. returned home. S.S. was first dropped off at her aunt's house, but Kimberly, who was also there, sent S.S. home. Once S.S. got home, a cousin came by to find S.S. upset. After some prompting, S.S. told the cousin that Peele had touched her. The cousin called Kimberly and told her she needed to come home. S.S. told Kimberly that Peele had touched her. Kimberly called the police. An investigation ensued, resulting in Peele's indictment on one count of indecency with a child by sexual contact. A jury trial was held in January 2025. The State presented four witnesses and Peele presented three.

Given the issues presented for our review, each witness's testimony is presented in sequential order below.

*The State's Witnesses*

1) *Jack Derby*

The State's first witness was Wilson County Sheriff's Office criminal investigator Jack Derby. Derby initially testified that his understanding of what occurred was that S.S. was hired by Peele to babysit and was touched inappropriately while at Peele's house. Derby told the jury that because S.S. was a minor, he scheduled a forensic interview for her. From information learned during the interview, he understood that the touching occurred either at the pool party or while the two were riding a four-wheeler. Derby explained that he did not gather physical evidence in this case because physical evidence is not commonly present in "touching" cases, but that he did seize and download the contents of Peele's cell phone pursuant to a warrant.

Without objection or an offer to admit the text messages into evidence, Derby testified to the contents of the downloaded messages from Peele's phone, including: text messages between Peele, Kimberly, and S.S. facilitating the details of the babysitting; and text messages between Peele and S.S. later that night in which Peele asked S.S. to make some food, and "then later on [S.S.] responds by calling him a bitch, and then . . . Peele responds to [S.S.] by calling her a whore." Derby's direct examination concluded with his testimony generally describing what "grooming" is and that grooming is common in child sex cases.

On cross-examination, Derby testified that he did not interview C.P., S.S., or any other potential witnesses from the pool party, and that he viewed the text messages between S.S. and Kimberly while S.S. was at Peele's house and did not see anything concerning.

## 2) Kimberly

The State's next witness was Kimberly. She told the jury that, based on a family friend's recommendation, a text message group chat was started between her, Peele, and S.S. about S.S. babysitting for Peele. The plan for the first day was that S.S. would go with Peele and C.P. to a birthday party and then spend the night at Peele's house to see whether S.S. and C.P. got along. After agreeing to allow S.S. to go with Peele that day, Kimberly stated she saw S.S. with Peele at an H–E–B gas station. That night, she explained that she and S.S. texted just to check in, but that was the extent of their communication. The following day, Kimberly was at the aunt's house when S.S. was dropped off. She testified she sent S.S. home because S.S. was "being rude." Shortly thereafter, however, she was called home by a cousin, who said S.S. was upset. This sparked the following exchange during trial:

| State: | Okay. Now, once you got – received that call from your cousin and you went home, what did you do at that point? |
| --- | --- |
| Kimberly: | Well, we talked a little bit, but she didn't at first tell me anything that happened. |
| State: | Okay. |
| Kimberly: | And then she told me – |
| Peele's Counsel: | Objection, hearsay. |
| State: | Your Honor, it would be present sense impression, Your Honor, of what she told her at the time and she is the outcry. |
| Peele's Counsel: | I don't believe that she was listed as the outcry, Judge. Nonetheless, this individual [S.S.] is here to testify. |
| State: | She was listed as the outcry, Your Honor. |
| Peele's Counsel: | We did not have an outcry – hearing on the outcry, Judge. |
| Trial Court: | All right. Ladies and gentlemen, we need to take some things up outside of your presence. |

The trial court held a hearing outside the jury's presence, ultimately overruling Peele's hearsay objection after the State acknowledged that Kimberly was not the outcry witness. When the jury returned, Kimberly testified that S.S. told her that she had been touched by Peele and that Kimberly felt S.S. meant the touch was sexual in nature, so she called the police.

*3)  S.S.*

S.S. testified that Peele touched her right after she turned fourteen, which would have been in March 2021. However, she acknowledged the alleged touching, as indicted, occurred in May 2021. S.S. testified that after Kimberly approved her babysitting, she, Peele, C.P., and R.W. went to Peele's house before the pool party so C.P. and R.W. could change into bathing suits. As she was walking up the stairs to enter Peele's house, S.S. explained that Peele raised his hand and touched her buttocks. When they returned to Peele's vehicle to go to the party, S.S. stated that Peele told her, "I wish I was [*sic*] as old as you and I was still an eighth grader." S.S. testified that she thought the touching as she was walking up the stairs could have been an accident and that what Peele told her in the vehicle freaked her out, but she did not say anything.[2]

At the pool party, S.S. alleged that Peele's hand grazed her buttocks twice more while they were swimming. After swimming, the four drove four-wheelers on nearby abandoned property. At first, C.P. and S.S. rode together. Then S.S. rode with Peele. While Peele drove and S.S. sat behind him holding him from the back, S.S. testified Peele said, "I like the way your boobs feel on my back." S.S. next told the jury that Peele asked her if he was freaking her out; S.S. initially replied yes, but then changed her mind and said no. While on the four-wheelers, S.S. alleged Peele grabbed S.S.'s inner thighs on both sides, and, when they had switched positions, so S.S. was driving, Peele went from holding her around the waist to holding her breasts and said that they "felt nice." S.S.

---

[2] On cross-examination, S.S. testified that she did not remember if she saw Kimberly at H–E–B when she was with Peele, C.P., and R.W.

testified that after grabbing her breasts, Peele told her "you better stop before I get some of you" and that he told her that she "gave him a boner."

After leaving the party, the four went back to Peele's house and rode the four-wheelers some more. Later that evening, while the girls were in C.P.'s room on their phones, S.S. testified that they decided to make some fries as a snack and asked Peele to help. After making the fries, Peele returned to his room. S.S. testified that she offered to bring Peele's fries to him in his room, and when she did, he said, "Well, aren't you going to feed daddy?" S.S. stated she declined but handed Peele the fries, and the two talked. During their conversation, which included discussing the recent death of her father, S.S. claimed that Peele had swung his leg to the wall between the door and her, effectively blocking her in. As she hugged up against the wall to squeeze by his leg to leave the room, S.S. testified Peele said "yes, you better leave before I get some." S.S. explained that she tried to discuss Peele's behavior with C.P., but C.P. became defensive. S.S. did not recall whether she and Peele exchanged text messages calling each other expletives, as referenced by Derby.

S.S. recounted that the next morning she and the other two girls got their nails done, and then Peele took S.S. to her aunt's house. S.S. testified that when she got to her aunt's house, she tried to talk to Kimberly in private, but her aunts were there, and she got upset when Kimberly said they could talk later, so she left and went home. When she got back home, her cousin came by and asked what was wrong. She broke down, and her cousin called Kimberly to come home.

*4) Sandy Dominguez*

The State's final witness was forensic interviewer Sandy Dominguez. Dominguez did not conduct S.S.'s forensic interview. Rather, Dominguez's testimony focused on the nature and processes of forensic interviews in general.

*Peele's Witnesses*

1) *R.W.*

According to R.W.'s testimony, before going to the pool party, the four went back to Peele's house, and the girls watched movies in C.P.'s room. After watching movies, the four went to the pool party. R.W. did not recall going to H–E–B before the party, but she did recall seeing Kimberly at H–E–B the following day after the girls got their nails done. After riding four-wheelers following the party and at Peele's house, R.W. told the jury that Peele made the girls nachos, and the girls returned to C.P.'s room. S.S. then showed R.W. and C.P. text messages between S.S. and "an 18-year-old." R.W. testified that she was watching Peele and S.S. the entire time while the two were on the four-wheelers and that there was never a time that Peele and S.S. were by themselves.

2) *C.P.*

C.P. testified that, after they picked up S.S., the four took the four-wheelers to H–E–B to get gas. C.P. stated that they specifically went to H–E–B to allow Kimberly and Peele to meet. C.P. told the jury that after leaving H-E-B Peele drove the girls to the pool party, but before they got in the pool, the four rode four-wheelers. While riding four-wheelers, the girls took turns riding with Peele. C.P. testified that Peele took the girls up and down a hill, but she did not recall S.S. and Peele ever being on a four-wheeler together alone.

When they returned to Peele's house, C.P. testified R.W. and S.S. rode the four-wheelers some more, and then they all ate nachos in her room while Peele was in his room. She did not remember anyone making fries. While the girls were in her room, C.P. stated that S.S. was on the phone with her 18-year-old boyfriend. C.P. testified that she told Peele about S.S. and her 18-year-old boyfriend, and Peele thought it was cool.

*3) Jessica Malaer*

Jessica Malaer had been Peele's on-again, off-again girlfriend for the past fifteen years. Malaer testified that she came over to Peele's house after midnight on the day in question. When she arrived, she said Peele snuck her into his room so the girls wouldn't see her. Malaer stated that after she got there, one of the girls asked for nachos or a snack. She did not recall whether Peele made the snack, but she said that if he left the room, it was only for a split second, long enough to show the girls where the food was and come back. She did not recall whether Peele ever left the room the rest of the night because she was sleeping on and off.

*The Verdict*

After closing arguments, the jury found Peele guilty and recommended a sentence of two years' confinement. The jury further recommended that the confinement be probated. On appeal, Peele raises six issues challenging the sufficiency of the evidence supporting the jury's verdict, evidentiary issues, and the State's closing argument. For the reasons below, we address the merits of two of Peele's issues but find the other four unpreserved for our review.

SUFFICIENCY OF THE EVIDENCE

*Standard of Review and Applicable Law*

We conduct a sufficiency review by looking at all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899–902 (Tex. Crim. App. 2010). We resolve any inconsistencies in the testimony in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). We "defer to the jury's credibility and weight determinations because the jury is the 'sole judge' of witnesses' credibility and the weight to be given testimony." *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012). "When

evaluating the sufficiency of the evidence, an appellate court considers the evidence in light of a hypothetically correct jury charge as authorized by the charging instrument." *Rodriguez v. State*, 274 S.W.3d 760, 767 (Tex. App.—San Antonio 2008, no pet.). "An appellate court cannot act as a thirteenth juror and make its own assessment of the evidence." *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018). "A court's role on appeal is restricted to guarding against the rare occurrence when the factfinder does not act rationally." *Id*.

Peele's single count indictment was for the alleged contact on the four-wheeler with S.S., in which she claimed he grabbed her breasts and told her he had an erection. A person commits the offense of indecency with a child if, among other things, he touches the breast of someone younger than 17 years of age with the intent to arouse or gratify the sexual desire of anyone. *See* TEX. PENAL CODE § 21.11(a)(1), (c)(1); *Gonzalez v. State*, 522 S.W.3d 48, 57 (Tex. App.—Houston [1st Dist.] 2017, no pet.). It is undisputed that S.S. was younger than 17 years of age at the time the alleged offense was committed. Thus, the State was required to prove that Peele touched S.S.'s breast with the intent to arouse or sexually gratify any person, including himself.

Peele argues the evidence adduced at trial is insufficient to support his conviction based on the amount of conflicting testimony presented from the seven witnesses. It is true that the witnesses produced conflicting evidence on the timing of the encounter, the sequence of events, and who was present during the alleged incidents. However, S.S. testified at trial. She explained that Peele placed his hands on her breasts and told her he had an erection. The jury, as the ultimate judge of credibility, could have chosen to believe S.S. and disregard testimony to the contrary. *See Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009) ("After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element."); *Clayton v. State*, 235 S.W.3d 772, 779 (Tex. Crim. App. 2007)

("The jury was presented with two conflicting theories-the State's and [the defendant's]. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial."). Because "[t]he uncorroborated testimony of the child can support a conviction for indecency with a child," we, as a reviewing court, will not step in as a thirteenth juror and disregard the jury's verdict when there is legally sufficient evidence supporting the same. *Romano v. State*, 612 S.W.3d 151, 158 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd); *Tienda v. State*, 479 S.W.3d 863, 873 (Tex. App.—Eastland 2015, no pet.) ("[A] complainant's testimony alone is sufficient to support a conviction for the offense of indecency with a child."); *Arroyo*, 559 S.W.3d at 487. Accordingly, we overrule Peele's sufficiency challenge.

## HEARSAY[3]

Next, Peele argues the trial court's admission of Kimberly's testimony regarding what S.S. told her when she returned home was impermissible hearsay. The State argues that the trial court properly admitted Kimberly's testimony under the present-sense-impression or excited-utterance exceptions to the hearsay rule. *See* TEX. R. EVID. 801(a)–(d); TEX. R. EVID. 803(1), (2). In the alternative, the State contends any error by the trial court in admitting the testimony was harmless. Assuming without deciding that the trial court erred in admitting the testimony under either of these exceptions to the hearsay rule, we ultimately hold any error to be harmless.

"The erroneous admission of a hearsay statement constitutes non-constitutional error that is subject to a harm analysis." *Campos v. State*, 317 S.W.3d 768, 779 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); TEX. R. APP. P. 44.2(b). "It is well settled that the erroneous admission of testimony is not cause for reversal if the same fact is proven by other testimony not objected to." *Crawford v. State*, 595 S.W.3d 792, 806 (Tex. App.—San Antonio 2019, pet. ref'd) (internal

---

[3] Within his hearsay issue, Peele additionally alleged Kimberly's testimony violated his rights under the Confrontation Clause. We address this contention below.

quotations and citations omitted). S.S., who took the stand after Kimberly, testified without objection that she told Kimberly that Peele had touched her. Therefore, because the same evidence complained of by Peele was offered without objection, we hold the trial court's error in overruling Peele's hearsay objection, if any, was harmless. *Id.* at 806–07; TEX. R. APP. P. 44.2(b).

### UNPRESERVED ISSUES

In his remaining issues, Peele argues the trial court erred by: allowing Derby to testify as an expert witness on the topic of grooming; allowing the testimony of Sandy Dominguez because it constituted improper bolstering; failing to properly cure the State's improper jury argument; allowing Kimberly's testimony regarding what S.S. told her when she returned home in violation of the Confrontation Clause; and admitting certain exhibits over the course of the trial. The State contends that each of Peele's remaining appellate issues is not preserved for our review. We agree.

"A trial judge's decision on the admissibility of evidence is reviewed under an abuse of discretion standard and will not be reversed if it is within the zone of reasonable disagreement." *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). However, "[w]e may not determine whether a trial court erred in the admission of evidence unless error is preserved for our review." *Edwards v. State*, 497 S.W.3d 147, 162 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd). "To preserve error, a party must object and state the grounds for the objection with enough specificity to make the trial judge aware of the complaint, unless the specific grounds were apparent from the context." *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016) (citing TEX. R. APP. P. 33.1(a)(1)(A)).

### 1) Derby's Testimony, Dominguez's Testimony, and the State's Closing Argument

During Derby's testimony, he testified that he commonly sees "grooming" in child sex cases and generally described the meaning of the term as he understood it. On appeal, Peele argues

the trial court erred in allowing Derby to testify as an expert on grooming. Peele did not raise this objection during trial and did not otherwise properly preserve the error for our review. TEX. R. APP. P. 33.1(a)(1)(A).

Next, Peele argues the trial court erred in allowing Dominguez to testify because her testimony constituted impermissible expert opinion and improper bolstering. Dominguez's testimony primarily concerned the nature and processes of child forensic interviews. Dominguez did not interview S.S. and did not represent at trial that she had. However, like Derby's testimony, Peele did not raise any objections in the trial court to preserve these issues for our review. *Id.*

Finally, Peele argues that the trial court erred by allowing the State to present improper jury argument during closing arguments. Peele did not raise an objection to the State's closing argument, and appellate complaints centered on improper jury argument are subject to the general preservation rules. *See id.*; *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) ("[W]e hold a defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument forfeits his right to complain about the argument on appeal. . . . Before a defendant will be permitted to complain on appeal about an erroneous jury argument or that an instruction to disregard could not have cured an erroneous jury argument, he will have to show he objected and pursued his objection to an adverse ruling."); *see also Young v. State*, 137 S.W.3d 65, 70 (Tex. Crim. App. 2004) (establishing that if an instruction to disregard cannot cure the error, "the only suitable remedy is a mistrial, and a motion for a mistrial is the only essential prerequisite to presenting the complaint on appeal"). Accordingly, this issue is also unpreserved for our review.

*2) Confrontation Clause*

Peele asserts Kimberly's testimony also violated his rights under the Confrontation Clause. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. However, at trial, Peele only asserted a hearsay objection directed at Kimberly's testimony regarding S.S.'s statements to her when she arrived home. Although hearsay and the Confrontation Clause can intertwine in many situations, "an objection on hearsay does not preserve error on Confrontation Clause grounds." *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005). Here, it is undisputed that Peele did not object to Kimberly's testimony based on the Confrontation Clause, and even if he had, S.S. testified at trial and was subject to cross-examination. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Crawford*, 595 S.W.3d at 801, 807. Accordingly, this issue is unpreserved for our review.

*3) Exhibits Neither Offered Nor Admitted*

Lastly, Peele argues the trial court erred in admitting photographs of Peele's residence and the pool area, text messages between Peele and Kimberly, and a forensic report compiled from a download of Peele's phone. We have reviewed the entire record, and not one of these exhibits complained of on appeal by Peele was offered or admitted by the trial court. Accordingly, there is nothing for us to review.

## CONCLUSION

We overrule Peele's appellate issues and affirm the trial court's judgment.

Lori I. Valenzuela, Justice

DO NOT PUBLISH